IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Gary Kirk, | ) | C/A No.  0:17-cv-2189-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Nancy A. Berryhill, Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Following the First World War, "a primarily agrarian American society had become a primarily urban, industrialized one."  Commissioner Martha A. McSteen, *Fifty Years of Social Security*, Social Security Bulletin 36 (1985).[1]  This led to a greatly increased reliance on cash wages, which became problematic as the Great Depression ravaged the nation during the early 1930s.  Catastrophic economic losses occurred throughout the country, and, "[b]y the mid-1930's, the lifetime savings of millions of people had been wiped out."  *Id.* at 37.  Faced with an aging population on the brink of "living their remaining years in destitution," Congress acted by passing the Social Security Act of 1935 ("the Act").  *Id.*  President Franklin D. Roosevelt, in signing the Act into law on August 14, 1935, stated: "This law, too, represents a cornerstone in a structure which is being built but is by no means complete."  *Id.* at 38.

Much of the industrial revolution was quite literally fueled by coal mined from Kentucky and West Virginia's mountains.  With dangerous work comes increased physical injury.  Much of Appalachia has spent the greater part of the twentieth century

_____

[1] An electronic copy of this article is available on the Social Security Administration's website.  https://www.ssa.gov/policy/docs/ssb/v48n8/v48n8p36.pdf.

enduring hard, physically exhausting, and dangerous labor to provide energy for the United States. American growth and prosperity was borne on the backs of these blue collar workers. As disability rates increased across the country, in 1956, Congress expanded the Social Security system to include payments to disabled workers. Now, every year, millions of Americans receive Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). These benefits are often the only means by which disabled individuals can provide food and shelter for their families. Given the importance of these benefits, Congress and the Social Security Administration ("SSA") have established a complex administrative system to determine (and redetermine) whether individuals are properly receiving benefits. *See, e.g.,* 42 U.S.C. § 405. This administrative system is overseen by the SSA, but it is moored by the procedural due process requirements of the United States Constitution.

While this case comes to the Court by way of a request for judicial review, it is not the typical administrative appeal that this Court sees on a daily basis; instead, this case presents important questions of due process and administrative procedure related to the SSA's redetermination process. Specifically, this case involves a massive fraud scheme perpetrated by attorney Eric Conn, two corrupt ALJs, and several doctors. After the SSA uncovered and pursued this scheme, it discontinued the benefits of thousands of attorney Conn's clients and required them to have their benefits redetermined. Plaintiff was one of those clients, and the SSA discontinued his benefits, finding that his benefits were based on a fraudulent medical report. Yet, despite the critical importance of whether this report was accurate or inaccurate, the SSA prohibited Plaintiff from challenging its determination that the report was fraudulent. Plaintiff contends that due process requires

more, and this Court agrees.  Prior to addressing Plaintiff's claims, the Court turns to the lengthy history underlying this case.

## BACKGROUND

### I.    Attorney Eric Conn's Scheme to Defraud the SSA

Throughout Kentucky, attorney Eric Conn was known as "Mr. Social Security." Senate Committee on Homeland Security and Governmental Affairs, *How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm* 1 (Oct. 7, 2013) (hereinafter, "Senate Report").[2]  "At the height of his success in 2010, Mr. Conn employed nearly 40 people and obtained more than $3.9 million in legal fees from [the] SSA, making him the agency's third highest paid disability lawyer that year."  *Id.*  Today, Mr. Conn is disbarred and resides in the Federal Correctional Institution – Hazelton, serving a 27-year prison sentence as a result of a complex scheme to defraud the SSA.

"The scheme, according to the SSA, worked like this:  Conn created a limited number of template Residual Capacity ("RFC") forms, which he or attorneys in his office filled out ahead of time."  *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 793 (6th Cir. 2018) (citation omitted).  "These forms, which are normally meant to convey a claimant's ability to do work-related activities on a day-to-day basis in a regular work setting, were purportedly manipulated to ensure that they satisfied the SSA's criteria for establishing a disability."  *Id.* (internal citations and quotations omitted).  Four doctors—Bradley Adkins, Ph.D.; Srinivas Ammisetty, M.D.; Frederic Huffnagle, M.D.; or David P. Herr, D.O—"then

---

[2] A copy of the Staff Report is available at: https://www.hsgac.senate.gov/imo/media/doc/ REPORT%20Conn%20case%20history%20report-final%20%20(10-7-13).pdf.

signed these forms without making any adjustments, and Conn submitted the forms to the SSA on behalf of his clients." *Id.* (citation omitted). Former ALJ David Daugherty, "who was allegedly receiving bribes from Conn, then assigned Conn's cases to himself and issued favorable rulings to Conn's clients." *Id.* (citation omitted). Former ALJ Daugherty "scheduled as many as 20 hearings form Mr. Conn's clients in a single day, moving them through in 15 minute increments." Senate Report at 2. "Eventually, Judge Daugherty stopped holding hearings for Mr. Conn's cases altogether, instead deciding them 'on the record' in large numbers—and always favorably." *Id.*

Given the gravity of the alleged scheme, one would expect that the SSA would act as soon as it learned about the fraud. To the contrary, it took the SSA nearly a decade to begin to close the book on the Conn scheme. "The SSA first learned about possible wrongdoing involving Daugherty and Conn as far back as 2006, when a senior case technician[3] and a master docket clerk[4] in the SSA's Office of Disability Adjudication and Review (which houses the ALJs) raised concerns that Daugherty was reassigning Conn's cases to himself and rapidly deciding them in the claimants' favor." *Hicks*, 909 F.3d at 793 (citation omitted). In response to these complaints, supervisors retaliated against the employees, ultimately leading to the resignation of Jennifer Griffith in October 2007. ECF No. 7-1 at 12. "At the time of her resignation, [Griffith] cited the reason for her leaving as the 'misconduct of ALJ David Daugherty' by which she was referring to 'his misappropriation of the cases and deciding those favorably based on the attorneys assigned them.'" *Id.* (quoting Tr. of Evidentiary Hearing 28, *Griffith v. Conn*, No. 11-cv-

---

[3] Sarah Carver.

[4] Jennifer Griffith.

157 (E.D. Ky. Sept. 8, 2014)).  In July 2009, Ms. Griffith called SSA's Office of Inspector General ("OIG") to report the misconduct.  *Id.*

Eventually, the Wall Street Journal published an article in May 2011, "highlight[ing] Daugherty's practice of taking Conn's cases and awarding benefits and not[ing] that '[a] possible connection between Messrs. Daugherty and Conn is a subject of the inspector general's investigation.'"  *Hicks*, 909 F.3d at 793 (quoting Damian Paletta, *Disability-Claim Judge Has Trouble Saying "No,"* Wall St. J. (May 19, 2011)).  "Also in 2011, the U.S. Senate Committee on Homeland Security and Governmental Affairs launched an investigation into Daugherty's unusually quick adjudication of disability claims and unusually high rate of granting benefits."  *Id.*  "The Committee issued a report in October 2013 finding that 'Judge Daugherty worked with Mr. Conn in inappropriate ways to approve a high volume of cases submitted by the Conn Law Firm.'"  *Id.* (quoting Senate Report at 5).

"After publication of the *Wall Street Journal* article in May 2011, [the] SSA instituted a number of reforms to correct the situation in Huntington, including reinstituting the assignment of cases to all ALJ's (sic) on a strict rotational basis."  Senate Report at 2. "Mr. Conn, Judge Daugherty, and Chief Judge Andrus[5] also took steps in reaction to the article."  *Id.*  "According to the testimony of former employees, and corroborated by documentary evidence, Mr. Conn's office purchased several disposable prepaid cellular phones for the purpose of allowing Mr. Conn and Judge Daugherty to talk."  *Id.* at 2–3. Mr. Conn then "systematically destroyed several dozen of the Conn Law Office's computers, and hired a local shredding company to clear out a large warehouse full of

---

[5] ALJ Charles Paul Andrus was the Chief ALJ of the Huntington office.

documents." *Id.* at 3. Conn's misconduct did not stop there, however, as he devised a plan with Chief Judge Andrus to discredit senior case technician Sarah Carver, one of the initial whistleblowers from 2006. *Id.* "According to former Conn and SSA employees as well as a recorded SSA [OIG] interview in which Judge Andrus admitted his part, he and Mr. Conn worked together to have video surveillance conducted of Ms. Carver on days when she worked from home in an attempt to catch her violating the office's telework policies." *Id.*

Despite the overwhelming evidence of corruption in the Huntington SSA office, the SSA did not place former ALJ Daugherty on administrative leave until 2011 and allowed former Chief ALJ Andrus to remain in the office until September 2013, when the SSA finally placed former Chief ALJ Andrus on administrative leave pending a removal action. *Id.* At the time the Senate Report was issued in October 2013, Mr. Conn was still representing claimants seeking disability benefits and had "even opened a new office in California." *Id.*

By July 2014, the SSA's OIG "had identified 1,787 individuals—all of whom had been represented by Conn—whose applications, the OIG 'had reason to believe,' were tainted by fraud." *Hicks*, 909 F.3d at 794. "This tag has statutory significance." *Id.* Under the Act, "the SSA is required to 'immediately redetermine' a beneficiary's entitlement to disability benefits if, at any point after granting benefits, the SSA has 'reason to believe that fraud or similar fault was involved in the application' for benefits." *Id.* (quoting 42 U.S.C. § 405(u)(1)(A)). Under the Act, "[t]he SSA may, however, delay redetermination proceedings if 'a [state or federal prosecutor] with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action

by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud.'" *Id.* "Notwithstanding the SSA's *clear statutory mandate* to 'immediately redetermine' benefits upon suspicion of fraud, the OIG provided the 1,787 names to the SSA with the understanding that SSA was not to take *any adverse action* against any individual on the list until further notice." *Id.* (internal citations and quotations omitted) (emphasis added).

It was not until May 12, 2015, that OIG finally informed the SSA that it could proceed with redetermination hearings. *Id.* Upon receiving the green light to proceed, the SSA notified more than 1,500 individuals (including Plaintiff) that it was instituting redetermination proceedings. *Id.* Critically, however, the SSA informed the individuals that it would be disregarding any evidence from the four medical providers listed above if that evidence was presented by Mr. Conn in a prior hearing before former ALJ Daugherty. Not only were the RFC determinations excluded, *all evidence*, including quantitative testing and behavioral observations, was excluded in the redetermination proceedings. *Id.* Thus, nine years after the SSA first learned about the fraud, and in apparent disregard of the Act's immediacy requirement, the SSA began redetermining whether Mr. Conn's clients were entitled to disability benefits.

The repercussions of these delayed redetermination proceedings were immediate and severe. Approximately 800 former Conn clients lost their benefits. *UPDATE 800 Former Conn Clients "Likely to Get Benefits Back,"* WSAZ (April 30, 2019), https://www.wsaz.com/content/news/Disability-lawyer-Eric-Conn-arrested-being-held-for -FBI-374559171.html. These individuals have struggled to feed their families and obtain

adequate medical treatment. *Id.* Tragically, at least four former Conn clients have committed suicide. *Id.* Remarkably, however, almost 200 lawyers and law students volunteered their services to help Conn's former clients challenge their denials in federal court. *Id.* The Court commends these attorneys for their pro bono service and outstanding advocacy. Indeed, in this case alone counsel travelled from Kentucky twice at their own expense to represent Plaintiff in hearings before this Court. It is this type of advocacy and commitment to public service that brings great credit to the bar.

Initially, the cases filed by these pro bono attorneys were largely unsuccessful, as district court judges rejected due process challenges to the redetermination process. However, a series of cases was assigned to (then) United States District Judge Amul Thapar of the Eastern District of Kentucky.[6] Judge Thapar found that the SSA denied Amy Jo Hicks, a former Conn client, the right to a meaningful hearing in violation of the Due Process Clause. *See Hicks v. Colvin*, 214 F. Supp. 3d 627 (E.D. Ky. 2016), *aff'd by* 909 F.3d 786 (6th Cir. 2018). Specifically, Judge Thapar found that the SSA's prohibition on claimants' challenging the exclusion of evidence submitted by Conn from the four doctors named above was a violation of the claimants' procedural due process rights. *Id.* After issuing his decision in *Hicks*, Judge Thapar issued a similar decision in each of the other six cases assigned to him. *Hicks*, 909 F.3d at 796. At the same time, several other district judges rejected the very same challenges by other claimants. Inevitably, the case went to the United States Court of Appeals for the Sixth Circuit, which ultimately affirmed Judge Thapar's opinion in a split decision, finding that the SSA's refusal to allow claimants

---

[6] Judge Thapar was subsequently elevated to the United States Court of Appeals for the Sixth Circuit.

the fair opportunity to rebut assertions that medical reports were fraudulent violated the minimal protections of procedural due process and the formal-adjudication requirements of the Administrative Procedure Act ("APA"). *See id.* at 813 ("The Due Process Clause of the Constitution and the Administrative Procedure Act required the SSA to allow plaintiffs an opportunity to show why the medical reports uniformly and entirely disregarded in their redetermination proceedings were not, in fact, tainted by fraud."). The SSA filed a Petition for Rehearing En Banc, which was denied by the full Sixth Circuit. ECF No. 73-1. Senior Judge John M. Rogers, who dissented from the panel majority, was the only judge indicating that he would grant rehearing *en banc. Id.* On June 19, 2019, Justice Sonia Sotomayor granted Defendant's application to extend the time to file a petition for a writ of certiorari. *See Saul v. Hicks*, No. 18A1319 (June 19, 2019).

It is undeniable that Mr. Conn's illegal behavior has devastated the lives of thousands of people and led to extensive civil and criminal litigation. Indeed, Mr. Conn and former ALJ Daugherty have both been sentenced to federal prison. Mr. Conn pled guilty and was initially sentenced to 12 years' incarceration, but that sentence was extended to 27 years' incarceration after Mr. Conn fled the country pending sentencing and was located in Honduras after six months on the run. Former ALJ Daugherty was sentenced to 4 years' incarceration. Alfred Bradley Adkins, Ph.D., was convicted of conspiracy, mail fraud, wire fraud, and making false statements, and was sentenced to 25 years' incarceration. Chief Judge Andrus pled guilty and was sentenced to 6 months' incarceration.

With this lengthy factual and procedural history in mind, the Court turns to the facts of this case.

## II. Plaintiff's Initial Award of Benefits and Redetermination Hearing

The parties set forth, in detail, Plaintiff's medical history in their briefing. By way of summary, Plaintiff has experienced serious health issues for over twenty years. Plaintiff has been treated multiple times for fibromyalgia, joint pain, muscle weakness, Bell's Palsy, anxiety, depression, suicidal ideations (and at least one suicide attempt), Arnold Chiari malformation, and hypertension.

Plaintiff filed applications for DIB and SSI benefits on November 18, 2008, claiming a disability onset date of December 1, 2006. After an initial denial, Plaintiff, represented by Mr. Conn, requested a hearing on his claims before an ALJ.[7] Former ALJ Daugherty issued a fully favorable decision dated November 2, 2009. ECF No. 43-4 at 11–15. Former ALJ Daugherty found that Plaintiff suffered from the following severe impairments: Arnold-Chiari Syndrome, Bell's Palsy, Sciatica, and Low Back Pain, and had the "residual functional capacity to lift 8–10 pounds occasionally and 5 pounds frequently, stand/walk 2–3 hours per work day, sit 3 hours per work day, only occasionally crawl and never

---

[7] The record indicates that Plaintiff also contacted Senator John D. Rockefeller, IV, who became involved in assisting with his application for benefits. There is a handwritten note from Plaintiff in the record stating that he reached out to Senator Rockefeller and believes that his application was ultimately approved with Senator Rockefeller's assistance. ECF No. 43-7 at 76. In fact, Plaintiff's note intimates that he learned of his approval from Senator Rockefeller's office prior to hearing from Mr. Conn's office. *Id.* There are several letters in the record that were exchanged between Senator Rockefeller and the SSA. *See* ECF No. 43-6 at 20 (September 9, 2009 letter from SSA Area Administrator to Senator Rockefeller informing him that Plaintiff's claim was denied); *id.* at 19 (September 15, 2009 letter from Senator Rockefeller to Plaintiff expressing regret about the denial and informing Plaintiff that Senator Rockefeller would "like to contact officials again on your behalf" if Plaintiff requested a hearing). Former ALJ Daugherty actually wrote Senator Rockefeller a letter the day Plaintiff's fully favorable decision was issued informing Senator Rockefeller of the approval. *Id.* at 18. Senator Rockefeller wrote Plaintiff a congratulatory letter on November 16, 2009. ECF No. 43-7 at 78.

climb." *Id.* at 13. Former ALJ Daugherty found "that the information provided by Dr. Huffnagle most accurately reflects [Plaintiff's] impairments and limitations,"[8] gave little weight to the State agency medical consultants' physical assessments, and limited Plaintiff to "sedentary work at best." *Id.* at 13–14. Accordingly, former ALJ Daugherty found that Plaintiff has been under a disability as defined in the SSA since December 1, 2006, and issued a written decision on November 2, 2009. *Id.* at 13, 15. Thereafter, Plaintiff began receiving benefits from the SSA.

After OIG notified the SSA that there was reason to believe fraud was involved in certain cases involving Mr. Conn, the Appeals Council informed Plaintiff on May 18, 2015 that it was redetermining former ALJ Daugherty's decision awarding Plaintiff benefits. Thereafter, the Appeals Council reviewed Plaintiff's case, disregarded Dr. Huffnagle's opinion at the direction of OIG, and determined that former ALJ Daugherty's decision was not supported by the remaining evidence. ECF No. 43-4 at 19–21. On August 19, 2015, the Appeals Council vacated former ALJ Daugherty's decision and remanded the case to a new ALJ for a new hearing and further redetermination proceedings.[9] *Id.* In the new

---

[8] Dr. Huffnagle prepared an examination and medical report in 2009 which largely formed the basis for former ALJ Daugherty's decision. Dr. Huffnagle died on October 5, 2010. Therefore, the only means by which Plaintiff can rehabilitate the Dr. Huffnagle report is by having the opportunity to contest the underlying determination that it was procured by fraud.

[9] Plaintiff contends in his brief that the Appeals Council's decision "is missing from this administrative record and Plaintiff does not recall ever receiving any such document or notice." ECF No. 52 at 2. Part of this confusion may be due to the new ALJ's factually erroneous recitation of the procedural history. The new ALJ claimed that the Appeals Council issued a decision vacating former ALJ Daugherty's decision on July 2, 2014. ECF No. 43-3 at 20. The record does not support this statement. The record indicates that the Appeals Council first notified Plaintiff of its redetermination on May 18, 2015, and issued a formal decision vacating former ALJ Daugherty's decision on August 19, 2015.

proceeding, the new ALJ was charged with determining whether Plaintiff "was entitled to and eligible for benefits on November 2, 2009, the date SSA initially allowed the claim." ECF No. 43-3 at 20. By law, the new ALJ was prohibited from considering any evidence from Dr. Huffnagle in the redetermination proceeding, and Plaintiff was not permitted to challenge the exclusion of that evidence. *Id.* at 21.

On August 8, 2016, Plaintiff's counsel submitted a detailed Pre-Hearing Memorandum outlining Plaintiff's history of serious medical issues. ECF No. 43-7 at 93–102. In this Memorandum, Plaintiff's counsel objected to the procedures being used in the redetermination process. Specifically, Plaintiff's counsel stated:

> [Plaintiff] also objects that the procedures used in these redetermination proceedings violate his right to due process. First, there was a more than four year delay between the discovery of Mr. Conn's alleged fraud and the decision to hold a new hearing in [Plaintiff's] case. This delay has materially prejudiced [Plaintiff's] ability to present his case. In addition, [Plaintiff] has not been given a sufficient chance to object to the exclusion of the report of Dr. Frederic Huffnagle, M.D. For these reasons, [Plaintiff] respectfully asks the Court to order that his disability benefits be continued.

*Id.* at 94. The remainder of the Memorandum details Plaintiff's medical history during the relevant time period and contains substantive legal argument as to Plaintiff's disability claim and due process concerns. *Id.* at 98–102.

On August 10, 2016, the new ALJ held a video hearing, where Plaintiff was represented by counsel. On January 13, 2017 or January 20, 2017,[10] the new ALJ issued an unfavorable decision finding that Plaintiff was not disabled during the relevant time

---

ECF No. 43-4 at 17-21. It appears the new ALJ's reference to a July 2, 2014, date is a scrivener's error.

[10] The new ALJ's decision lists both dates and it is not clear what date she issued her decision. *See* ECF No. 43-3 at 32 (listing both dates).

period.  The new ALJ determined that Plaintiff only suffered from severe impairments of anxiety and depression, and did not concur with former ALJ Daugherty's findings of numerous other severe impairments.  ECF No. 43-3 at 24.  The new ALJ found that Plaintiff's other impairments "have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a 'severe' level for a continuous period of 12 months, are not expected to result in death, or have not been properly diagnosed by an acceptable medical source."  *Id.* at 24–25.  Great weight was "given to the assessment of . . . Mark Burns, M.D., the internal medicine consultative examiner," who opined that Plaintiff "had no limitations in functions such as sitting, standing, lifting, or carrying."  *Id.* at 25.  In contrast, little weight was "given to the assessments of the State agency medical consultants."  *Id.*  Based on the record (absent Dr. Huffnagle's report), the new ALJ found that Plaintiff "had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] could tolerate occasional, superficial contact with the general public."  *Id.* at 27.  Based on this determination, the new ALJ found that Plaintiff "was capable of performing past relevant work as a financial clerk and carpet measurer" and was, therefore, not disabled.  *Id.* at 30.

After the new ALJ's denial, Plaintiff requested review from the Appeals Council. Plaintiff's counsel submitted a detailed Memorandum of Law in Support of Request for Review, which again contained a detailed medical history, legal argument about Plaintiff's disability claim, and legal argument about Plaintiff's due process concerns.  ECF No. 43-8 at 2-13.  Plaintiff's counsel argued:

> [Plaintiff] is not guilty of any wrongdoing.  He simply had the misfortune of
> hiring an attorney who allegedly did not live up to the ethical standards of

the legal profession, and of having [his] case heard by an ALJ who decided to aid and abet Mr. Conn's misconduct. The fraud in this case was more or less out in the open from its inception, and it became public knowledge as early as 2011. As far as the Commissioner has revealed, there was no Department of Justice investigation that required a delay in re-determining the Conn cases. In light of all the facts and circumstances, [Plaintiff] would submit that the Commissioner failed to satisfy the statutory requirement that the reconsideration proceeding be conducted "immediately."

*Id.* at 9–10. On June 20, 2017, the Appeals Council denied review of the new ALJ's decision.[11]

### III. Procedural History of Plaintiff's Request for Judicial Review

On August 17, 2017, Plaintiff filed a Complaint in this Court, alleging five causes of action. ECF No. 1. Count I alleges violations of the SSA and accompanying regulations, Count II alleges violations of Plaintiff's due process rights, Count III alleges violations of the APA, Count IV alleges that the ALJ's redetermination decision is unsupported by substantial evidence, and Count V alleges that the Appeals Council's decision is unsupported by substantial evidence. *Id.* at 4–5. The following day, Plaintiff filed a Motion for Preliminary Injunction, seeking to reinstate his DIB and SSI benefits during the pendency of this case. ECF No. 7. Defendant filed a Response in Opposition to Plaintiff's Motion for Preliminary Injunction on November 21, 2017, and filed a Partial Motion to Dismiss on November 29, 2017. ECF Nos. 17, 21. Defendant's Partial Motion to Dismiss seeks dismissal of Counts I-III of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 21. Plaintiff filed a Response in Opposition to this

---

[11] The index to the record and Defendant's brief indicate that the Appeals Council decision can be found at Page 113 of the record. The record filed with the Court skips from Page 60 to Page 137. *See* ECF Nos. 43-2 at 62 (Page 60 of the record); 43-3 at 2 (Page 137 of the record). However, the parties apparently do not dispute that the Appeals Council denied review.

Motion and a Reply in support of his Motion for Preliminary Injunction on December 13, 2017. ECF Nos. 23, 24. Defendant filed a Reply in support of her Partial Motion to Dismiss on December 19, 2017. ECF No. 26.

These Motions were referred to United States Magistrate Judge Paige J. Gossett, who held a hearing on February 7, 2018. ECF No. 38. Counsel for the SSA participated in the hearing by telephone. *Id.* On February 20, 2018, Judge Gossett issued a Report and Recommendation ("Report") recommending that Plaintiff's Motion for Preliminary Injunction be denied. ECF No. 40. The Report acknowledged that several district courts have addressed the procedural due process issue, but emphasized that all but one have found no constitutional violation. *Id.* at 7. Plaintiff filed Objections to the Report, and Defendant filed an Answer to Plaintiff's Complaint. ECF Nos. 41, 42.[12] Thereafter, the parties filed briefs on the merits of Plaintiff's claims. ECF Nos. 52, 54, 61. Additionally, Plaintiff filed a Motion to Amend Complaint, seeking to challenge the appointment of the SSA's ALJs.[13] ECF No. 64.

On January 16, 2019, Magistrate Judge Gossett issued an Order staying the case and holding all pending motions in abeyance pending final resolution of a series of identical cases by the United States Court of Appeals for the Sixth Circuit. ECF No. 70. The Order recognized that the Sixth Circuit held in *Hicks v. Commissioner of Social Security*, 909 F.3d 786 (6th Cir. 2018), that the SSA "had violated the claimants'

---

[12] The Report did not address Defendant's Partial Motion to Dismiss.

[13] Plaintiff's Motion to Amend followed the Supreme Court of the United States' decision in *Lucia v. Sec. & Exch. Comm'n*, 138 S. Ct. 2044 (2018), which held that the appointment of the Securities and Exchange Commission's ALJs violated the Appointments Clause of the United States Constitution.

procedural due process rights and the formal-adjudication requirements of the Administrative Procedure Act."[14]  *Id.* at 2.  Nonetheless, Magistrate Judge Gossett noted that the Sixth Circuit opinion contained a dissent and was not yet final because the SSA would likely be seeking rehearing *en banc.*  *Id.*  On April 3, 2019, Plaintiff filed a Suggestion of Final Decision, informing the Court that the Sixth Circuit issued an Order denying the SSA's Petition for Rehearing En Banc.  ECF No. 73.  Defendant then filed a Supplemental Brief Regarding the Sixth Circuit Court of Appeals Decision.  ECF No. 74. By and large, Defendant's Supplemental Brief simply argued that the Sixth Circuit's majority opinion was incorrect and asked this Court to disregard its reasoning.  *Id.*

In light of the uncertainty as to whether the SSA would seek certiorari in the Supreme Court, the lengthy process that would entail, the age of this case, and the need for Plaintiff to receive a final determination of his claims, the undersigned lifted the stay. ECF No. 76.  Additionally, this Court assumed responsibility for determining the merits of Plaintiff's Complaint.[15]  Thereafter, the Court held a telephonic status conference with the parties on May 16, 2019.  ECF No. 82.  During the call, the Court informed the parties that it would be assuming responsibility for disposition of this case, scheduled a final hearing for June 7, 2019, and directed that an attorney from the SSA should be present at the final hearing.  ECF No. 82, 83.  The Court heard oral arguments from all parties at

---

[14] Plaintiff had previously filed a Motion to Stay pending disposition of *Hicks* by the Sixth Circuit.  ECF No. 48.  Defendant opposed this Motion, and Magistrate Judge Gossett summarily denied the Motion.  ECF No. 50.

[15] Generally, Social Security cases are automatically referred to a United States Magistrate Judge for a Report in this District.  Local Civil Rule 73.02(B)(2)(a) (D.S.C.).  In light of the length of time this case has been pending, the Court exercised its power under Local Civil Rule 73.02(D) (D.S.C.) to assume responsibility for disposing of the case.

the final hearing on June 7, 2019, and informed the parties that it would issue a ruling by written order.

## DISCUSSION

As detailed above, Plaintiff raises five claims in his Complaint. After reviewing the relevant law, the Court finds that the due process claim is dispositive of this case and limits its discussion to that issue.[16] Although the Court has grave concerns about whether the SSA complied with the Act's "immediacy" requirement and the APA, the Court need not reach those issues to grant Plaintiff the relief he seeks in this case. For the reasons set forth below, the Court adopts the reasoning of *Hicks* in toto and finds that the SSA's redetermination process violates the minimal requirements of due process.

Plaintiff's due process challenge focuses on the SSA's refusal to afford him an opportunity to rebut the OIG's determination that Mr. Conn procured Dr. Huffnagle's report by fraud. As an initial matter, this Court must determine what the appropriate test is for evaluating Plaintiff's due process claim. The Sixth Circuit in *Hicks* adopted the claimants' argument that the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), is not entirely dispositive of the unique claims in this case. Instead, the Sixth Circuit held that "the SSA's procedures violate long-standing principles of procedural due process that predate the *Mathews* test." *Hicks*, 909 F.3d at 797. However, the Sixth Circuit alternatively held that "[e]ven under *Mathews* . . . plaintiffs would prevail." *Id.*

---

[16] The Court recognizes Plaintiff's arguments on the other issues raised in his Complaint. The Court need not reach those issues given its finding of a violation of procedural due process. However, the remaining issues may be appropriate alternative sustaining grounds if the SSA challenges this Order on appeal.

After reviewing the arguments made by Plaintiff and Defendant in this case, the Court cautiously adopts the approach used by the Sixth Circuit. In doing so, the Court is nonetheless guided by the test set forth in *Mathews*, and finds no discord between the Sixth Circuit's approach and a more explicit application of *Mathews*. It is often said that imitation is the sincerest form of flattery, and, in accordance with that principle, the Court restates and incorporates by reference the relevant analysis by the Sixth Circuit in *Hicks*.

> Long before *Mathews*, the Supreme Court recognized the 'immutable' principle that 'where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.'" *Greene v. McElroy*, 360 U.S. 474, 496 (1959). Both in *Mathews* and subsequently, the Court has reaffirmed this basic tenet. *See Mathews*, 424 U.S. at 346 (holding that the SSA's process for terminating disability benefits satisfies constitutional due-process requirements because beneficiaries are able "to challenge directly the accuracy of information in [their] file[s] as well as the correctness of the agency's tentative conclusions"); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); *id.* at 553 (Souter, J., joined by Ginsburg, J., concurring in relevant part) ("[S]omeone in [the defendant's] position is entitled at a minimum to notice of the Government's claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker."); *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[D]ue process require[s] the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts . . . [that are] relevant to the inquiry at hand."). As the government's action in this case "depends on fact findings" that the [Plaintiff has] not been provided the opportunity to rebut, the government's process is constitutionally inadequate. *See Greene*, 360 U.S. at 496.

*Hicks*, 909 F.3d at 797–98 (citations modified).

Defendant contends the Sixth Circuit "demot[ed] *Mathews* to back-up status" and argues that the "Sixth Circuit's decision directly contradicts both Supreme Court precedent and unambiguous authority from the Fourth Circuit." ECF No. 74 at 3. Not so.

The Sixth Circuit did not hold that *Mathews* is no longer good law.  To the contrary, the Sixth Circuit recognized that procedural due process is necessarily fact specific and that bedrock principles of constitutional law (including *Hamdi*, which was issued nearly thirty years after *Mathews*) provide a better guidepost in these unique cases.

Indeed, *Mathews* sets forth three factors for courts to use when determining whether a procedural due process violation has occurred: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.  These factors guide the Court's inquiry, and the Court holds that each of these factors supports a finding that the SSA's redetermination process violates Plaintiff's procedural due process rights.

First, the private interest that is affected by the SSA's redetermination process is enormously significant.  It is black letter law that social security disability recipients have a substantial interest in receiving their benefits, as "the hardship imposed upon the erroneously terminated disability recipient may be significant."  *Mathews*, 424 U.S. at 342. "Denial of benefits results in a failure to receive income required to purchase the necessities of life, including medication, and causes anxiety and distress which can aggravate existing conditions."  *Day v. Shalala*, 23 F. 3d 1052, 1059 (6th Cir. 1994).  "The Supreme Court has recognized that 'suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the

belated restoration of back benefits.'"  *Id.* at 1059–60 (quoting *Schwelker v. Chilicky*, 487 U.S. 412, 428 (1988)).

Second, the risk of an erroneous deprivation under the SSA's redetermination procedures is equally significant.  "The SSA argues that the current process leaves little room for error, as plaintiffs may rely on a host of other evidence beyond the Conn-related medical reports, including evidence that was not submitted in the initial determination, and the Conn-related reports would, in any event, be a low-weighted factor in the ALJ's analysis."  *Hicks*, 909 F.3d at 800.  Again, the SSA misses the point.  Plaintiff is being completely precluded from rebutting a very material factual assertion about his case, i.e., that the Conn-related evidence was procured by fraud.  It is unrealistic to require a claimant to be able to reconstruct their medical history from a decade ago, particularly within the short time table allotted by the SSA.  Many, if not most, claimants provide the only copies of their medical records to their attorneys during the claims process.

As the SSA acknowledges, Mr. Conn destroyed many of these records.  But that is not the whole story.  When Mr. Conn went to prison, "approximately 6,000 to 7,000 client files relating to claims for social security benefits remained in his former Kentucky law office," which was forfeited to the United States.  *Court Appoints Receivers to Inventory and Distribute Client Files of Lawyer Involved in Largest Social Security Fraud Scheme in History*, United States Department of Justice (Nov. 1, 2008).[17]  Yet, the Government did not provide these files—which indisputably belong to the clients—or even

---

[17]        https://www.justice.gov/opa/pr/court-appoints-receivers-inventory-and-distribute-client-files-lawyer-involved-largest-social.

acknowledge their existence until after the initial redetermination hearings concluded.[18] Distribution of these files brings along with it a host of problems, including locating thousands of Mr. Conn's clients who now may be homeless, destitute, and without a working telephone number. This highlights the fundamental unfairness in prohibiting Plaintiff, and other claimants, from challenging the SSA's apparently infallible determination that all of the records associated with the four doctors were procured by fraud. What if, for example, one of the doctors administered a quantitative IQ test to help demonstrate that a claimant met the applicable listing for intellectual disability? Should that claimant have the ability to prove that the objective test was scored correctly? Procedural due process dictates the answer to that question—a resounding, "Yes." The risk of erroneously depriving Plaintiff of a fair hearing absent an opportunity to rebut the SSA's finding of fraud is simply intolerably high.

Finally, the burden on the Government in permitting Plaintiff to challenge the determination that Dr. Huffnagle's records are fraudulent is minimal when viewed in the context of the SSA's handling of this scheme. Certainly, there will be a burden to the SSA in permitting Plaintiff to cross examine an OIG investigator about his or her determination of fraud. But the degree of that burden is largely of the SSA's own doing. The factual record is clear that the SSA was dilatory in taking any action to put an end to Mr. Conn's fraud. No one claims that Plaintiff had any knowledge of Mr. Conn's scheme, yet the SSA asks the Court to deprive Plaintiff of the opportunity to challenge the SSA's belated finding of fraud due to the effect it would have on the public fisc. Nonetheless, viewing the case

---

[18] At this time, it is unclear whether Plaintiff's file was present in Mr. Conn's office or was destroyed.

as a whole, we do not "believe that forcing OIG investigators to testify in over 1,500 redetermination hearings would be particularly onerous given that SSA investigators would have to do the same thing if they developed a 'reason to believe' fraud existed in 1,500 applications for benefits." *Hicks*, 909 F.3d at 803 (quoting 42 U.S.C. § 405(u)).

Turning to the question of what remedy is appropriate, the Court finds that remand of Plaintiff's case to the SSA is proper. It is important to note, however, that the Court is expressly reversing the SSA's prior redetermination decision. Therefore, the Court is remanding this case to the SSA under Sentence Four of 42 U.S.C. § 405g. As Judge Thapar wisely opined: "If a process cannot be trusted, neither can its result. And a process that violates due process—as [Plaintiff's] redetermination process did—cannot be trusted. Its results therefore cannot stand." *Hicks v. Berryhill*, No. 16-154-ART, 2017 WL 1227929, at * 2 (E.D. Ky. March 31, 2017). Accordingly, the SSA is directed to immediately return Plaintiff to the position he was in before the agency's decision by resuming paying Plaintiff and adjusting any overpayment that it has sought from Plaintiff until it proves through a constitutional hearing that he is not entitled to benefits.

## CONCLUSION

For these reasons the SSA's decision is **REVERSED** and the Court remands this matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

July 9, 2019
Spartanburg, South Carolina